Judge Pauley

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

LAURI COHEN BADER,

Plaintiff,

- against -

MICHAEL AINSLIE, JOHN F. AKERS, ROGER S. BERLIND, THOMAS H. CRUIKSHANK, MARSHA JOHNSON EVANS, RICHARD FULD, JR., SIR CHRISTOPHER GENT, ROLAND A. HERNANDEZ, HENRY KAUFMAN, JOHN D. MACOMBER, and LEHMAN BROTHERS HOLDINGS INC.,

Defendants.

-------------------------------------x

Civil Action No.: 06 CV 5884

**Jury Trial Demanded**




**<u>VERIFIED COMPLAINT</u>**

Plaintiff alleges, upon information and belief based upon, *inter alia*, the investigation made by and through her attorneys, except as to those allegations which pertain to the plaintiff herself which are alleged upon knowledge, as follows:

1. The jurisdiction of this Court is founded upon 15 U.S.C. §78aa for the claims based on the 2006 Proxy Statement arising under §14(a) of the Securities Exchange Act, 15 U.S.C. §78n(a), Rule 14a-9 of the Securities and Exchange Commission (the "SEC"), 17 C.F.R. §240.14a-9, Schedule 14A, 17 C.F.R. §240.14a-101, and Reg. S-K, 17 C.F.R. §229.402. For claims addressing the defects in the 2003 Executive Compensation Plan (the "Plan"), jurisdiction is founded on 28 U.S.C. §§1331 and 1367. For all other claims, jurisdiction is founded on 28 U.S.C. §1367.

2. The claims herein arise under §14(a) of the Securities Exchange Act, 15 U.S.C. §78n(a), SEC Rule 14a-9, 17 C.F.R. §240.14a-9, Schedule 14A, 17 C.F.R. §240.14a-101, and Regulation S-K, 17 C.F.R. §229.402, and under §162(m) of the Internal Revenue Code, 26 U.S.C. §162(m), and 26 C.F.R. §1.162-27 promulgated thereunder, and under the laws of the several states including, particularly, the State of Delaware.

3. Plaintiff brings this action derivatively in the right of and for the benefit of Lehman Brothers Holdings Inc. (the "Company" or "Lehman Brothers").

4. This action is not a collusive one to confer jurisdiction on this court which it would not otherwise have. This action is not a securities fraud class action and does not present the possibility of abuse that Congress sought to remedy with the Private Securities Litigation Reform Act of 1995 (Pub. Law 104-67, 109 Stat. 737), *i.e.*, class actions charging fraud based on complicated, false accounting statements, every time a stock price fell a few points, with expensive discovery procedures that in themselves are so harsh that they might coerce settlement. It does not seek to recover damages, but rather specific, equitable relief. This case does not fall into the pattern of the usual securities fraud action, and application of those legal requirements must be adjusted to fit this particular action.

5. Plaintiff is a stockholder of the Company and has been such continuously since October 31, 2001 and throughout the time of the wrongs alleged herein to the present.

**DEMAND EXCUSED ALLEGATIONS**

6. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

7. Plaintiff brings this derivative action in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company as result of breaches of fiduciary duty, and material misstatements and omissions in the Proxy Statement.

8. Plaintiff had not made any demand on the Company's board of directors to institute this action against the individual defendants. The demand requirement and its exceptions are to encourage intra-corporate resolution of disputes and obtain the business judgment of the board on whether the litigation is in the best interest of the corporation and its shareholders. However, where a stockholder sues the board of directors over an act that is not a decision concerning the management of the business and affairs of the corporation, the business judgment rule does not apply. Delaware law excuses demand whenever the challenged act of the board is not the product of a valid exercise of business judgment, regardless of whether a majority of the board is disinterested and independent. The board's conduct concerning the misrepresentations and omissions, and in violating the express terms and provisions of the Plan are not matters of business judgment, and they are not protected by the business judgment rule for the following reasons:

(a) When a corporate board solicits stockholder's votes at their annual meeting, the board owes the stockholders a fiduciary duty of fair disclosure, meaning that all material facts must be disclosed and no material facts may be omitted. This duty of disclosure is a thing apart from the duty and authority to deal with the business and property of the corporation. Courts give deference to a corporate board of directors as to questions of management of the corporation's business, but not as to questions of the board's performance of its disclosure duties, and for two reasons. First, a board's decision, even in good faith, to misstate or to omit a material fact cannot be defended on the grounds that reasonable persons could differ on the

subject. Second, although courts may not be well suited to making business decision, courts are well suited to deciding questions concerning the quality of, and circumstances surrounding, disclosures.

(b) As with Delaware law, under federal policy, there is no need for prior demand on the board of directors with respect to the claim of misrepresentations and omissions in the Proxy Statement.

(c) At bar, the Proxy Statement contains materially false or misleading statements and omissions concerning the value of options granted to executive officers, and the premises and assumptions used in evaluating stock options under the Black-Scholes option pricing model, and it omits material facts concerning the potential amount of bonuses , under federal law and under Delaware law.

(d) To the extent that the demand requirement is governed by Delaware law, if a demand is made and rejected, the stockholder's challenge must be not to the underlying transaction, but to the board's decision not to bring the lawsuit. Delaware law thus substantially alters the nature of a derivative plaintiff's claim where demand has been made and conversely gives shareholders considering litigation good reason not to make demand.

(e) The entire board is neither disinterested nor independent since every member of the board is liable for the material misstatements and omissions in the Proxy Statement.

**FIRST CLAIM**

**(Under the Securities Exchange Act of 1934 and Re-incorporating ¶¶1-6)**

9. The Company is incorporated in the State of Delaware. The Company's stock is listed on the New York Stock Exchange and on the Pacific Exchange and traded on the NASDAQ National Market. Its fiscal year ends on November 30. As of January 31, 2006, the

Company had 270,408,498 shares of common stock outstanding and approximately 22,450 stockholders of record. On April 5, 2006, the Board of Directors approved a 2-for-1 common stock split, in the form of a stock dividend, for holders of record as of April 18, 2006, to be effective on April 28, 2006. As of July 31, 2006, the last reported sales price by the close of market of the common stock was $64.66, post-split.

10. Lehman Brothers is a global investment bank founded in 1850. It is a market leader in investment banking, equity and fixed income sales, research and trading, investment management, private equity, and private banking. It is a primary dealer in the U.S. Treasury securities market. Its primary subsidiaries include: Lehman Brothers Inc., Neuberger Berman Inc., Aurora Loan Services, Inc., SIB Mortgage Corporation, and Lehman Brothers Bank.

11. The individual defendants who constitute the Company's Board of Directors authorized the distribution of the proxy statement dated February 27, 2006 (the "2006 Proxy Statement") to solicit the proxies of Lehman Brothers' stockholders for, *inter alia*, the re-election of defendants Cruikshank, Hernandez, Kaufman, and Macomber to the Board of Directors, the ratification of the selection of Ernst & Young LLP as the independent registered public accounting firm for the current year, approval of the adoption of an increase in the number of authorized common shares and the approval of the adoption of annual election of all directors. The 2006 Proxy Statement contains a table showing the compensation of Executive Officers and refers to the 2003 Short-Term Executive Compensation Plan ("2003 Compensation Plan" or the "Plan").

12. The Plan by its terms required the approval of the Company's stockholders to become effective.

13. All the defendants permitted the use of their names in the 2006 Proxy Statement to solicit proxies.

14. The individual defendants, except for Hernandez, who joined the Board in 2005, Evans, who joined the Board in 2004 and Gent, who joined in 2003, are now, and have been at all relevant times, the members of the Board of Directors of the Company.

15. With respect to the solicitation of proxies for the annual meeting of stockholders in the year 2006, the 2006 Proxy Statement contains materially false or misleading statements and omits material facts concerning the compensation of the Company's officers and directors. The purpose of a proxy statement is to inform the stockholders, not to challenge their critical wits. As a result, the 2006 Proxy Statement renders the stockholders unwitting agents of self-inflicted damage.

16. The Proxy Statement violates Regulation S-K and Schedule 14A. Item 8 of Schedule 14A, 17 C.F.R. §240.14a-101, pertains to Compensation of Directors and Executive Officers. It mandates that a proxy statement must furnish the information required by Item 402 of Regulation S-K when the stockholders are solicited to elect directors. 17 C.F.R. §229.402(c)(2). Sub-item (c)(2) of Item 402 requires the following information to be disclosed in a proxy statement (bold and italics added):

i. The name of the executive officer;

ii. Number of securities underlying options/SARs granted;

iii. The percent the grant represents of total options and SARs granted to employees during the fiscal year;

iv. The per-share exercise or base price of the options or SARs granted. If such exercise or base price is less than the market price of the underlying

security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant;

v. The expiration date of the options or SARs; and

vi. Either (A) the potential realizable value of each grant of options or freestanding SARs or (B) the present value of each grant, as follows;

A. The potential realizable value of each grant of options or freestanding SARs, assuming that the market price of the underlying security appreciates in value from the date of grant to the end of the option or SAR term, at the following annualized rates:

1. 5%;
2. 10%; and
3. if the exercise or base price was below the market price of the underlying security at the date of grant, provide an additional column labeled 0%, to show the value at grant-date market price; or

B. ***The present value of the grant at the date of grant, under any option pricing model.***

The 2006 Proxy Statement used (c)(2)(vi)(B). Item 402 (c)(2) contains instructions: Instruction 9 provides as follows (bold and italics added):

> Where the registrant chooses to use the grant-date valuation alternative specified in **paragraph (c)(2)(vi)(B)** of this item, the valuation shall be footnoted to describe the valuation method used. ***Where the registrant has used a variation of the Black-Scholes or binomial option pricing model, the description shall identify the use of such pricing model and describe the assumptions used relating to the expected volatility, risk-free rate of return, dividend yield and time of exercise.*** Any adjustments for non-

transferability or risk of forfeiture also shall be disclosed. In the event another valuation method is used, the registrant is required to describe the methodology as well as any material assumptions.

The Option Grants in Last Fiscal Year section of the Proxy Statement states (bold and italics added):

> These values were calculated using the Black-Scholes option pricing model as of the grant date. The Black-Scholes model is a mathematical formula that is widely used and accepted for valuing market traded stock options. ***The model is premised on immediate exercisability and transferability of the options, neither of which was true for the options granted to the named executive officers at the time of grant.***

Proxy Statement at 21.

This statement is materially false or misleading as to the premises of the Black-Scholes option pricing model. The statement is materially false or misleading in that it states that the options are presumed to be immediately exercisable under the Black-Scholes option pricing model. It also represents that the options granted to Fuld and the other executives are not immediately exercisable and transferable.

17. The 2006 Proxy Statement contains a section labeled as "Option Grants in Last Fiscal Year." Proxy at 21-22. The chart on page 21 is as follows:

**OPTION GRANTS IN LAST FISCAL YEAR**

| Name | Number of Securities Underlying Options Granted (a) | Percent of Total Options Granted to Employees in Fiscal Year | Exercise or Base Price Per Share | Expiration Date | Grant Date Present Value (b) |
|---|---|---|---|---|---|
| R.S. Fuld, Jr. | 450,000 | 13.1 | $85.80 | 12/8/2009 | $5,040,000 |
| J.M. Gregory | 350,000 | 10.2 | 85.80 | 12/8/2009 | $3,920,000 |
| D. Goldfarb | 300,000 | 8.7 | 85.80 | 12/8/2009 | $3,360,000 |
| T.A. Russo | 150,000 | 4.4 | 85.80 | 12/8/2009 | $1,680,000 |
| J. Beyman | 0 | -- | -- | -- | -- |

The above chart, on a pre-split basis, represents the Grant Date Values for the four officers. On December 9, 2004, the date of grant, the stock options have an expiry of five years, become exercisable in four-and-a-half years, and have an exercise price equal to the fair market value on

the date of the grant. If the market price of the Common Stock exceeds a specified target price, the options have accelerated exercisability, to no earlier than two years. Until the target stock price is achieved, exercisability of the options is delayed until four and one-half years after the date of grant. The Proxy Statement states that (italics added):

> Five-year nonqualified stock options were granted to Messrs. Fuld, Gregory, Goldfarb and Russo on December 9, 2004 with terms providing for *exercisability in four and one-half years…*

The Proxy Statement, on page 22, continues to state that (italics added):

> The following assumptions were used in employing the Black-Scholes option pricing model: an exercise price equal to the closing price of the Common Stock on the date of grant; *an expected time to exercise of three years…*

Therefore, the value of the unexercised options is incorrectly estimated. Under the Black-Scholes option pricing model, the longer the expiry period the more valuable is the option. Except when it is close to expiration, the value of the option is always greater than the value it would have if it were exercised immediately. Valuations on a particular date must be based on facts known on that date. Hence, the estimate at the date of grant, using three years to exercise, was made with hindsight. It is impossible to be certain on the date of grant that the exercise date would be accelerated. Moreover, it was false or misleading to take a discount from the grant date values based on lack of immediate exercisability and transferability.

18. In Fiscal Year Ending ("FYE") 2005, the target stock price set by the Committee was $110.00. The fair market value of the stock was $85.50 on the grant date. It did not reach $110.00 until September 2005. These prices are before the April 2006 2-for-1 stock split.

19. The Black-Scholes model does not assume that stock options are immediately exercisable. In an article published in the Journal of Political Economy in 1973, Black and

Scholes list the "ideal conditions" in the market for the stock and for the option in deriving their formula for the value of an option in terms of the price of the stock, including:

*d*) The option is "European," that is, it can only be exercised at maturity. Black, F. & Scholes, M., *The Pricing of Options and Corporate Liabilities*, 81 J. POL. ECON. 637, 640 (1973). By contrast to European options, an American option is immediately exercisable. Moreover, Black and Scholes, in their article, stated (bold and italics added):

> [Richard C.] Merton has shown, however, that the value of the option is always greater than the value it would have if it were exercised immediately ($x - c$). Thus, a rational investor will not exercise a call option before maturity, ***and the value of an American call option is the same as the value of a European call option.***

Black, F. & Scholes, M., *The Pricing of Options and Corporate Liabilities*, 81 J. POL. ECON. 637, 646 (1973).

20. The statement on page 21 in the Proxy is also materially false or misleading in that it states that the options are presumed to be transferable under the Black-Scholes option pricing model. It also represents that the options granted to Fuld and the other executives are not transferable.

21. In Lehman Brother's Form 10-K filed with the Securities and Exchange Commission for FYE 2005, under the section labeled Derivative Financial Instruments, on page 78, describes over the counter ("OTC") derivatives products as "privately-negotiated contractual agreements that can be tailored to meet individual client needs and include forwards, swaps and certain options including caps, collars and floors." As Richard C. Merton stated in his article published by the Harvard Business Review, a non transferable stock option can be hedged to extract its value, and in any event the lack of transferability does not affect the company cost. For these executives, there should be no discount in the option's value, for they know how to hedge these options to achieve the same results as if they were freely transferable.

Bodie, Zvi, Kaplan, Robert S., Merton, Robert C., *For The Last Time: Stock Options Are An Expense*, HARV. BUS. REV.62 (Mar. 2003).

22. Proxy statements from previous years 2002, 2003, 2004 and 2005 distributed by the Board of Directors, contain substantially similar misrepresentations in representing grant date values of stock options under the Black-Scholes option pricing model, in that they all assume that the options will be exercised before they can.

23. Proxy statements from previous years 2002, 2003, 2004 and 2005 contain substantially similar misrepresentations concerning immediate exercisability and transferability. The following tables show the correct grant date values under Black-Scholes option pricing models using the same volatilities and dividends expressed in the Proxy Statements for 2006, 2005, 2004, 2003 and 2002. All those proxy statements omitted to quantify the interest rates used, in violation of 17 C.F.R. §229.402(c)(2)(vi)(B)(Instruction 9). For the following tables, the interest rates were taken from the United States Treasury's reports of Yield Curve Rates, weighted between the 3 year rate and the 5 year rate, three quarters toward the 5 year rate. The interest rates used were 3.43% for FYE 2005, 3.02% for FYE 2004, 2.08% for FYE 2003, 4.85% for FYE 2002, and 5.46% for FYE 2001. In addition, Mr. Beyman received a 10 year option on 20,565 shares in FYE 2004, and the 2005 proxy statement assumed a 6 year expiry. The interest rate for Mr. Beyman was taken as 3.42% as the 6 year rate.

**Option Grants In Fiscal Year Ending 2005**

| Name | Number of Securities Underlying Options Granted | Exercise or Base Price Per Share | Expiration Date | Grant Date Present Value | Grant Date Value With 4½ Years to Exercise and Without Discounts |
|---|---|---|---|---|---|
| R.S. Fuld, Jr. | 450,000 | $85.80 | 12/8/2009 | $5,040,000 | $9,153,000 |
| J.M. Gregory | 350,000 | 85.80 | 12/8/2009 | 3,920,000 | 7,119,000 |
| D. Goldfarb | 300,000 | 85.80 | 12/8/2009 | 3,360,000 | 6,102,000 |
| T.A. Russo | 150,000 | 85.80 | 12/8/2009 | 1,680,000 | 3,051,000 |
| J. Beyman | 0 | -- | -- | -- | -- |

**Option Grants In Fiscal Year Ending 2004**

| Name | Number of Securities Underlying Options Granted | Exercise or Base Price Per Share | Expiration Date | Grant Date Present Value | Grant Date Value With 4½ Years to Exercise and Without Discounts |
|---|---|---|---|---|---|
| R.S. Fuld, Jr. | 450,000 | $71.39 | 12/9/2008 | $4,950,000 | $8,923,500 |
| J.M. Gregory | 350,000 | 71.39 | 12/9/2008 | 3,850,000 | 6,940,500 |
| D. Goldfarb | 250,000 | 71.39 | 12/9/2008 | 2,750,000 | 4,957,500 |
| T.A. Russo | 150,000 | 71.39 | 12/9/2008 | 1,650,000 | 2,974,500 |
| J. Beyman[1] | 20,565 | 71.39 | 11/29/13 | 307,447 | 483,071[2] |

[1] 10 years for Beyman

[2] Value based on a 6 year expiry.

**Option Grants In Fiscal Year Ending 2003**

| Name | Number of Securities Underlying Options Granted | Exercise or Base Price Per Share | Expiration Date | Grant Date Present Value | Grant Date Value With 4½ Years to Exercise and Without Discounts |
|---|---|---|---|---|---|
| R.S. Fuld, Jr. | 400,000 | $54.42 | 12/10/2007 | $4,372,000 | $7,960,000 |
| J.M. Gregory | 300,000 | 54.42 | 12/10/2007 | 3,279,000 | 5,970,000 |
| B.H. Jack | 300,000 | 54.42 | 12/10/2007 | 3,279,000 | 5,970,000 |
| D. Goldfarb | 200,000 | 54.42 | 12/10/2007 | 2,186,000 | 3,980,000 |
| T.A. Russo | 50,000 | 54.42 | 12/10/2007 | 546,500 | 995,000 |

**Option Grants In Fiscal Year Ending 2002**

| Name | Number of Securities Underlying Options Granted | Exercise or Base Price Per Share | Expiration Date | Grant Date Present Value | Grant Date Value With 4½ Years to Exercise and Without Discounts |
|---|---|---|---|---|---|
| R.S. Fuld, Jr. | 400,000 | $63.40 | 12/2/2006 | $4,900,000 | $9,856,000 |
| J.M. Gregory | 300,000 | 63.40 | 12/2/2006 | 3,675,000 | 7,392,000 |
| B.H. Jack | 300,000 | 63.40 | 12/2/2006 | 3,675,000 | 7,392,000 |
| J. Vanderbeek | 300,000 | 63.40 | 12/2/2006 | 3,675,000 | 7,392,000 |

**Option Grants In Fiscal Year Ending 2001**

| Name | Number of Securities Underlying Options Granted | Exercise or Base Price Per Share | Expiration Date | Grant Date Present Value | Grant Date Value With 4½ Years to Exercise and Without Discounts |
|---|---|---|---|---|---|
| R.S. Fuld, Jr. | 450,000 | $51.125 | 11/30/2005 | $4,500,000 | $9,189,000 |
| J.M. Gregory | 350,000 | 51.125 | 11/30/2005 | 3,500,000 | 7,147,000 |
| J.M. Isaacs | 350,000 | 51.125 | 11/30/2005 | 3,500,000 | 7,147,000 |
| B.H. Jack | 350,000 | 51.125 | 11/30/2005 | 3,500,000 | 7,147,000 |
| J. Vanderbeek | 350,000 | 51.125 | 11/30/2005 | 3,500,000 | 7,147,000 |

24. In describing the Black-Scholes option pricing model the Proxy Statement represents: "These hypothetical present values are presented pursuant to SEC rules even though there is no assurance that such values will ever be realized." Proxy Statement at 21. The foregoing representation is materially false or misleading. The SEC Reg. S-K, 17 C.F.R. §229.402(c)(2)(vi)(B) does not refer to values obtained by option pricing models as "hypothetical." Moreover, in the SEC Release *Executive Compensation Disclosure*, 1992 WL 301259 at *4 (Oct. 16, 1992), which made final 17 C.F.R. §229.402(c)(2)(vi)(B), the SEC refers to the Black-Scholes option pricing model as "a recognized valuation formula." The SEC there further said that such a formula will be permitted instead of "[h]ypothetical rates of stock price appreciation" described in 17 C.F.R. §229.402(c)(2)(vi)(A).

25. Moreover, the Black-Scholes value is not a forecast of the amount to be realized upon the exercise of the option in the future. It is the present value of a hedged portfolio that will equal the difference at maturity between the market price of the underlying stock and the exercise price of the option.

26. Unless an injunction is entered the directors will continue to mislead the stockholders as they have done for the last five years.

27. These misrepresentations are presumptively material for they refer to statements expressly and affirmatively required by SEC regulations.

28. All the defendants were negligent in that they knew or should have known that the omissions concerning the terms and provisions of the performance goals were material and available.

29. Defendants' acts have caused injury to the Company.

**SECOND CLAIM**

**(Under State Law and Federal Law excluding the Securities Exchange Act of 1934 Re-Incorporating ¶¶1-27)**

30. Under Delaware law, directors generally have a fiduciary duty to disclose all material facts when they seek stockholder action or communicate with stockholders. The fiduciary duty to disclose often overlaps the affirmative duties to disclose under the federal securities laws. Where the federal laws mandate disclosure, Delaware law requires that any disclosure made be full and fair. There need not be an affirmative disclosure requirement under federal law, however, for a fiduciary duty to disclose to arise under Delaware law. Moreover,

under Delaware law, stockholders are entitled to rely on the truthfulness of communications to them even if they are unrelated to requests for stockholder action.

31. The 2006 Proxy Statement states that the Plan, which was approved by stockholders in 2003, is "designed to preserve the tax deductibility of compensation in excess of $1 million" under Section 162(m) of the Internal Revenue Code. 26 U.S.C. §162(m).

32. The Plan, according to its terms, is designed to ensure that the bonuses be deductible under 26 U.S.C. §162(m), which means that the achievement of a bonus must be substantially uncertain at the time the committee establishes the formula. The 2003 Proxy Statement was distributed by the Company's Directors to solicit approval of the Plan.

33. The 2002, 2003, 2004, 2005 and 2006 Proxy Statements represent that the total compensation comprises a base salary and both cash and equity incentives, that the incentive compensation is based on the Company's financial performance, individual performance and other factors, and that the primary component of executive officer compensation for Fiscal Year 2005 was performance-based annual incentives derived from the Plan.

34. The 2002, 2003, 2004, 2005 and 2006 Proxy Statements represent that the Compensation Committee of the Board of Directors (the "Committee") establishes objective compensation formulas at the beginning of the year that incorporate the Company's financial goals.

35. The Plan never achieved valid stockholder approval because the performance measures are not objective and the plan does not meet 26 U.S.C. §162(m)(4). On page 24 of the 2003 Proxy Statement, under the heading Proposal 3, it contains the following statement:

> The Board therefore recommends stockholder approval of the STEP [Short-Term Compensation Plan] so that the Company may, if all other requirements of the regulations are met, fully deduct certain annual bonus payments to the Covered

> Employees (described below as "Special Bonuses") in compliances with Section 162(m) of the Code.
>
> ...If the Stockholders do not re-approve the STEP, no Special Bonuses will be paid under the STEP to Covered Employees, but Covered Employees may be paid other compensation, including Standard Bonuses. However, as a result of Section 162(m) of the Code, such other compensation might not be tax deductible.

This statement was intended to coerce the stockholders to vote for the Plan. Their choice, according to the representation in the Proxy Statement, was to vote for the Plan, make the incentive payments, and get the deductions, or vote against the Plan, and make the incentive payments anyway, and lose the deduction.

36. However, the aforesaid representation in the 2003 Proxy Statement, that bonuses under the Plan would be deductible if the stockholders approved the Plan, was materially false and misleading, for, even if the stockholders did vote for the Plan, the Company would not get the deduction. The defendants threatened to pay the incentive payments even if the Company's stockholders disapproved it. Accordingly, no vote of the stockholders would make it deductible. 26 C.F.R. §1.162-27(e)(4)(i).

37. All the defendants were negligent in that they knew or should have known that the representations concerning the deductibility of the incentive payments were materially false and misleading.

38. Section 162(m) limits the deductibility of compensation paid to the CEO and the four next most highly paid executives to $1 million unless the compensation is "performance based," which means the compensation is payable "on account of the attainment of one or more performance goals." 26 U.S.C. §162(m)(4)(C). For the year 2005 the amount of compensation to those executive officers exceeded $1 million each.

39. The 2006 Proxy Statement states that the "Committee establishes objective compensation formulas at the beginning of the year that incorporate the Company's financial goals. The formulas determine an amount of annual incentive payable upon the attainment of the goals...." 2006 Proxy Statement at 16-17.

40. The 2006 Proxy Statement omits the formulas that were used to determine the incentives. It also contains a list of descriptions of vague bonus targets that the Compensation Committee may or may not have considered.

41. The 2006 Proxy Statement was materially misleading in that it omitted to disclose the material terms and provisions under which the incentive compensation was and is to be paid.

42. The 2003 Proxy Statement, under the section labeled Bonuses Under the Plan stated that "[t]he provisions of this Section 4(c) shall be administered with Section 162(m) of the Code to ensure the deductibility by the Company or its affiliates of the payment of Special Bonuses. In Section 4(c), the Plan stated that

> the amount of a Participant's Special Bonus shall be an amount determinable from *written performance goals* approved by the Committee while the outcome is substantially uncertain and no more than 90 days after the commencement of the period to which the performance goal relates or, *if less, the number of days which is equal to 25 percent of the relevant performance period.*

2003 Proxy Statement at B-2 (italics added).

43. A performance period cannot be less than one year if a bonus is to be deductible.

44. The 2006 Proxy Statement states that under the Plan, the amount of annual incentive payable upon the attainment of the performance goals, which is paid in the form of a cash bonus and Restricted Stock Units ("RSUs"). RSUs are calculated by multiplying the closing market price of the Common Stock on the respective dates the awards were granted by the number of shares awarded.

45. Additionally, the performance goals listed in the 1996 Management Ownership Plan and the 2005 Stock Incentive Plan are not identical to the Plan.

46. All the defendants were negligent in that they knew or should have known that the omissions concerning the terms and provisions of the performance goals were material and available.

47. Defendants' acts have caused injury to the Company.

48. As members of the Board of Directors of the Company, the individual defendants owe it fiduciary duties of loyalty, and good faith under state law. They also owe the stockholders these duties and also fiduciary duties of disclosure. Each of the individual defendants has breached those duties. In addition, they have coerced the stockholders to vote for the Plan.

49. The aforesaid breach of duties of loyalty and good faith and misrepresentations to and coercion against the stockholders has caused injury to the Company.

WHEREFORE, plaintiff prays for the following relief:

A. Declaring void the vote of the stockholders for the Plan;

B. Cancellation of the Plan and an injunction against payments under it;

C. Equitable and/or injunctive relief against defendants from hereafter engaging in the practices as particularized above;

D. Voiding the elections of directors for 2005;

E. An equitable accounting in favor of the Company for the losses that it has and will sustain by virtue of the conduct alleged herein;

F. Awarding plaintiff the costs and disbursements of this action, including reasonable accountants', experts' and attorneys' fees; and

G. Granting such other, further relief, whether similar or different, as by this Court may be deemed just and proper.

A. ARNOLD GERSHON, P.C.

A. Arnold Gershon (3809)
1450 Broadway, 14th Floor
New York, New York 10018
(212) 575-7900

*Attorneys for Plaintiff*

*Of Counsel:*
Gloria Kui (not admitted in SDNY)
BALLON, STOLL, BADER & NADLER, P.C.
1450 Broadway, 14th Floor
New York, NY 10018
(212) 575-7900

VERIFICATION

STATE OF NEW YORK )
)ss:
COUNTY OF NEW YORK )

The undersigned LAURI COHEN BADER, plaintiff in the within action, verifies that she has read the foregoing COMPLAINT and knows the contents thereof; that the same are true to affirmant's own knowledge, except as to the matters therein stated to be alleged on information and belief; and as to those matters she believes them to be true.

The grounds of affirmant's belief as to all matters not stated to be upon affirmant's knowledge, are as follows:

Records in her possession and investigations caused to be made on her behalf.

Lauri Cohen Bader
LAURI COHEN BADER

Sworn to before me this
2 day of August 2006

Notary Public

DAVID B. SHAEV
NOTARY PUBLIC, State of New York
No. 02SH4733813
Qualified in Nassau County
Commission Expires June 30, 19 2012